## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KEVIN DASH,

     Plaintiff,

               v.

A BETTER GUTTER CLEANING, INC. and
DAVIS SEABORN,

     Defendants.

Civil Action No.
1:18-cv-04082-SDG

### ORDER

This matter is before the Court on Plaintiff Kevin Dash's motion for

conditional class certification [ECF 18] and Defendants A Better Gutter Cleaning,

Inc. ("ABGC") and Davis Seaborn's motion for summary judgment [ECF 36]. For

the following reasons, Defendants' motion is **GRANTED** and Dash's motion is

**DENIED AS MOOT**.

## I.      BACKGROUND

Unless otherwise noted, the following facts are not disputed by the parties

or are supported by undisputed evidence in the record. ABGC is a gutter repair

and cleaning company that serves the metro-Atlanta area.[1] Seaborn is ABGC's

---

[1]   ECF 41-1, ¶ 1.

part-owner and managing partner.[2] ABGC performs a variety of services including, but not limited to, gutter cleaning, gutter repairs, gutter protection, tree pruning, and skylight cleaning.[3] ABGC primarily markets and provides services to residential homeowners and commercial business.[4] None of the services provided by ABGC are for resale.[5] Depending on the nature of the job, ABGC's employees work in either a two-person or three-person crew.[6]

From May 2015 through August 2018, Dash was employed by ABGC as a crew foreman.[7] Dash was not paid an hourly wage; rather, he was compensated through ABGC's commission-based pay structure.[8] Dash's commission pay was calculated based on the total revenue listed on route sheets filled out by Dash and submitted to ABGC.[9] When working with a three-person crew, Dash received 10% of the gross revenue for the jobs performed.[10] With a two-person crew, he received

---

[2]   ECF 1, ¶ 11; ECF 41-1, ¶ 10.

[3]   ECF 41-1, ¶ 10.

[4]   *Id.* ¶ 8.

[5]   *Id.* ¶ 6.

[6]   *Id.* ¶ 17.

[7]   ECF 1, ¶ 18; ECF 41-1, ¶ 13.

[8]   ECF 41-1, ¶ 14.

[9]   *Id.* ¶ 18.

[10]   *Id.* ¶ 17.

13% of the gross revenue.[11] Dash was not paid overtime wages at any point during his employment.[12]

From May 2015 through May 2018, Dash was solely responsible for recording his hours on route sheets and submitting them to ABGC.[13] After May 2018, Dash's hours were additionally recorded through GPS technology associated with the van Dash used to perform jobs for customers.[14] Dash's daily hours reflected all the time between when he left ABGC to perform a job until he returned, irrespective of whether Dash was compensated for non-work activities (*i.e.* driving time, breaks, rain delays) during that period.[15] As part of his response brief, Dash argues that he should have been compensated for the time he spent performing non-work activities.[16] ABGC disputes this assertion.[17]

On August 28, 2018, Dash filed his Complaint as a collective action, asserting one claim under the Fair Labor Standards Act ("FLSA") against ABGC and

---

[11] *Id.*

[12] ECF 41-2 (Seaborn 30(b)(6) Dep. Tr. 73:10–16; 112:4–114:14); ECF 41-3 (Dash Dep. Tr. 152:8–21).

[13] *Id.* ¶ 22.

[14] *Id.* ¶ 23.

[15] *Id.* ¶¶ 22–23, 27.

[16] ECF 41-1, ¶¶ 21–28.

[17] *Id.*

Seaborn for the failure to pay Dash overtime wages.[18] On August 29, 2019, Defendants filed their motion for summary judgment, arguing Dash is not entitled to overtime compensation as an exempt employee under the FLSA.[19] Dash filed his response on October 3, 2019.[20] Defendants filed their reply on October 31, 2019.[21]

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*,

---

[18]    ECF 1.

[19]    ECF 36-1.

[20]    ECF 41-1.

[21]    ECF 47.

477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255. *See also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

### a.   The Fair Labor Standards Act

Congress enacted the FLSA in 1938 to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. In relevant part,

the FLSA requires employers to pay overtime of at least one-and-one-half times the regular rate to employees working more than 40 hours a week. 29 U.S.C. § 207(a)(1). A claim for unpaid overtime wages has two elements: "(1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work." *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015).

The FLSA also exempts several categories of employees from coverage. 29 U.S.C. §§ 207, 213. The Supreme Court recently held that, "[b]ecause the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a narrow) interpretation." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal punctuation omitted). "Whether an employee meets the criteria for an FLSA exemption, although based on the underlying facts, is ultimately a legal question." *Pioch v. IBEX Eng'g Servs., Inc.*, 825 F.3d 1264, 1268 (11th Cir. 2016) (*citing Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965–66 (11th Cir. 1997)).

One FLSA exemption, colloquially known as the "commissioned work exemption," applies to commissioned employees of retail or service establishments:

> No employer shall be deemed to have violated subsection (a) by employing any employee of a retail or service establishment for a workweek in excess of the

applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). Put another way, "[t]he retail or service establishment exemption applies where: (1) the employee was employed by a retail or service establishment; (2) the employee's regular rate of pay was more than one and one-half times the minimum hourly rate; and (3) more than half of the employee's compensation comes from commissions." *Lee v. Ethan Allen Retail, Inc.*, 651 F. Supp. 2d 1361, 1365 (N.D. Ga. 2009). *See also Amponsah v. DirecTV, LLC*, 278 F. Supp. 3d 1352, 1367 (N.D. Ga. 2017). As the employer, ABGC "bears the burden of proving the applicability of a FLSA exception by clear and affirmative evidence." *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001) (internal punctuation omitted). The Court addresses each element in turn.

> b.   **Analysis**
>
> > i.   **ABGC Qualifies as a Retail or Service Establishment.**

For the first element, while § 207(i) does not define "retail or service establishment," this Court—adopting the Department of Labor's ("DOL") guidance—has stated that:

> The term "retail or service establishment" means an establishment 75 per centum of whose annual dollar volume of sale of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry.

*Amponsah*, 278 F. Supp. 3d at 1367 (*citing* 29 C.F.R. § 779.411). Defendants must prove two elements to show ABGC's business was a retail or service establishment: (1) "its sales were not for resale" and (2) "its sales were recognized as retail in the particular industry." *Id.* at 1368 (*citing Jones v. Tucker Commc'ns, Inc.,* No. 5:11-cv-398 MTT, 2013 WL 6072966, at *5 (M.D. Ga. Nov. 18, 2013)).

### 1.  ABGC's Services Are Not Sales for Resale.

DOL guidance defines sales made for resale as those in which "the seller knows or has reasonable cause to believe that the goods or services will be resold, whether in their original form, or in an altered form, or as part, component, or ingredient of another article." *Jones*, 2013 WL 6072966, at *5 (*citing* 29 U.S.C. § 779.331). It is undisputed that none of the services provided by ABGC are for resale.[22] Dash does not dispute that 90% of ABGC's business consists of gutter cleaning services—an inherently non-resalable service.[23] In fact, Dash expressly concedes this element, as he "agrees that ABGC's services are not for

---

[22]   ECF 36-2, ¶ 6; ECF 41-1, ¶ 6.

[23]   ECF 41-1, ¶ 4.

resale."[24] Dash, nonetheless, makes a passing argument that gutter cleaning is only one of eight different services offered by ABGC.[25] This does not change the result, as Dash does not point to any legal authority for the proposition that offering other services disqualifies a company from obtaining status as a "retail or service establishment." Therefore, the services ABGC provides are not "sales for resale."

### 2. ABGC's Services Are Recognized as Retail in the Industry.

As a threshold issue, "a business must have a 'retail concept' . . . before the industry characterization of its sales can be considered." *Jones*, 2013 WL 6072966, at *6 (*citing Brennan v. Great Am. Disc. & Credit Co.*, 477 F.2d 292, 295 (5th Cir. 1973)). DOL guidance provides examples of the types of services generally recognized as retail:

> Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process. . . . It provides the general public its repair services and

---

[24]   ECF 41, at 2 n.2.

[25]   ECF 41-1, ¶ 4.

> other services for the comfort and convenience of such
> public in the course of its daily living.

29 C.F.R. § 779.318.

The parties do not dispute ABGC directly provides its gutter cleaning services to end consumers — the residential homeowners or commercial businesses that hire ABGC directly to perform the gutter cleaning services.[26] Likewise, the parties agree ABGC markets and advertises its gutter cleaning services through different media throughout the metro-Atlanta area.[27] Based on the record, ABGC operates at the end of the stream of distribution, serves the everyday needs of its customers, disposes of its services in small quantities, and takes no part in the manufacturing process. Thus, ABGC meets the qualifications of having a "retail concept." *Jones*, 2013 WL 6072966, at *8–9. *See also Alvarado v. Corp. Cleaning Serv., Inc.*, 719 F. Supp. 2d 935, 945 (N.D. Ill. 2010).

The second part of the inquiry is whether ABGC services are recognized as "retail" within its particular industry. The Court must take into consideration "the well-settled habits of business, traditional understanding and common knowledge." 29 C.F.R. § 779.324. This includes "the understanding and knowledge

---

[26]   ECF 41-1, ¶ 7.

[27]   *Id*. ¶ 8.

of the purchaser as well as the seller, the wholesaler as well as the retailer, the employee as well as the employer, and private and governmental research and statistical organizations." *Id.*

Defendants rely on three affidavits to establish that persons in, and with knowledge of, the gutter cleaning industry view ABGC's services as retail: (1) Charles Rollins, the owner of Any Window Cleaned, Inc. d/b/a Northside Gutter Cleaning, Inc.;[28] (2) Dickson Johnston, ABGC's co-founder and majority owner;[29] and (3) Davis Seaborn.[30] Rollins stated that, based on his knowledge and experience in the gutter cleaning industry, "[s]ales and services that are generally recognized as 'retail' in [the] industry include the retail sales of gutter cleaning services by a gutter cleaning company."[31] Johnston concurred and expressly differentiated between "retail sales of gutter cleaning services" (*i.e.* what ABGC does) and "certain specialized gutter installation contracts," the latter of which Johnston does not consider retail services.[32] Seaborn agreed and reiterated that

---

[28]   ECF 36-7.

[29]   ECF 36-6.

[30]   ECF 36-3, at 1.

[31]   *Id.* ¶ 4.

[32]   ECF 36-6, ¶¶ 9–10.

ABGC's business model is based on marketing and selling its gutter cleaning services to residential homeowners and commercial businesses.[33]

Dash argues these affidavits are "self-serving testimony."[34] However, he does not point to any evidence disputing or contradicting their assertions. The only portion of the record cited by Dash in support of his argument is a snippet of Seaborn's Rule 30(b)(6) deposition, which, according to Dash, shows that Seaborn "was unable to identify the industry in which [ABGC] conducts business."[35] Contrary to Dash's contention, this cherry-picked colloquy carries little weight, as Dash points to no legal authority for the proposition that a corporate officer must precisely identify a company's industry to qualify as a "retail or service establishment." Even so, Defendants point to numerous pieces of uncontroverted evidence demonstrating that ABGC is engaged in the gutter cleaning industry. Moreover, Dash's allusions to the lawn maintenance industry and citations to job postings listed by other gutter companies in the area offering prospective employees the possibility of overtime wages are wholly irrelevant to the issue presently before the Court.

---

[33]   ECF 36-3, ¶¶ 6–14.

[34]   ECF 41, at 7–8.

[35]   *Id*. at 7 (*citing* ECF 35 (Seaborn Dep. Tr. 65:25-66:19)).

In sum, Dash fails to point to any evidence creating a genuine issue of material fact. Therefore, Defendants have met their burden of establishing that ABGC has a retail concept recognized by its industry.

> ### ii. Dash's Regular Rate of Pay Exceeded the Statutory Requirement.

For the second element, Defendants must demonstrate that Dash's regular rate of pay was "in excess of one and one-half times the minimum hourly rate" to avail itself of the exemption. 29 U.S.C. § 207. "Regular rate of pay" is defined as the "hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed and by its very nature must reflect all payments which the parties had agreed shall be received regularly during the workweek, exclusive of overtime payments." *Klinedinst*, 260 F.3d at 1256 (internal punctuation omitted) (*citing* 29 C.F.R. § 779.419(b)). "The regular rate is determined by dividing the [employee's] total compensation during the workweek by the number of hours worked." *Id.* (*citing* 29 C.F.R. § 779.419(b) ("It is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate."). Throughout Dash's employment at ABGC, the federal minimum wage was legislatively set at $7.25 per hour. 29 U.S.C. § 206. One-and-one-half times $7.25 equals $10.88. Thus, to qualify for

the exemption, Dash's regular rate of pay must have exceeded $10.88 per hour for each workweek in which he asserts he is entitled to overtime wages.

Defendants argue Dash's rate of pay exceeded this threshold. They point to Seaborn's affidavit, which calculated Dash's compensation on a per-hour basis, even though Dash was paid through commissions, based on the hours Dash worked throughout his employment.[36] Based on the record, Dash's regular rate of pay for the weeks that he worked at least 40 compensable hours averaged $31.14 per hour and never dipped below $24.61 per hour.[37] Dash admits that "his total compensation, per week is accurately reflected" in the Seaborn affidavit.[38] Dash further admits that "he was paid at least 1.5 times the minimum wage for compensable work."[39] This is sufficient to satisfy the exemption. *Roeder v. DirecTV, Inc.*, No. C14-4091-LTS, 2017 WL 151401, at *31 (N.D. Iowa Jan. 13, 2017) ("[P]laintiffs' own testimony establishes they were paid more than one and one-half times the applicable minimum wage."). Dash's assertion that "Seaborn failed to explain what he did to make such verifications beyond keeping track of

---

[36]   ECF 36-3.

[37]   *Id*. at Ex. B.

[38]   ECF 41-1.

[39]   *Id*. at 21.

Mr. Dash's hours," without more, does not automatically diminish the accuracy of Seaborn's calculations, particularly in light of Dash's own concession that he was paid more than 1.5 times the minimum wage.[40]

Nonetheless, Dash asserts ABGC's calculation of his rate of pay is inaccurate because it does not account for the "approximately 40-50 percent of the time ABGC employees spend working on behalf of ABGC for which they receive zero compensation."[41] According to Dash, "ABGC pays its employees a commission without any regard to the hours worked" and "employees are only paid for the time they spend directly working on a client's property."[42] Dash contends he was "not compensated for direct work associated with, and necessary to, performing the direct work for ABGC's clients."[43] These allegedly non-compensated activities included the time Dash spent preparing his route, unloading the vans, filling out

---

[40]  ECF 41-1, ¶ 24 ("Plaintiff further clarifies that he was paid at least 1.5 time[s] the minimum wage for compensable work.").

[41]  ECF 41, at 20.

[42]  *Id*. at 14, 17.

[43]  *Id*. at 13.

route sheets, checking in with the office manager, rain delays, and driving to-and-from the job location.[44]

Dash's argument is unpersuasive. Although he was not compensated for certain activities during his workday—such as driving time, rain delays, and break time—Dash admits he was paid through commissions, not an hourly rate. As such, Dash has no right to seek compensation for work he agreed not to be compensated for performing. *See* 29 C.F.R. § 779.419 ("The meaning of the 'regular rate' of pay . . . by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek."); *Charlot v. Ecolab, Inc.*, 136 F. Supp. 3d 433, 452 (E.D.N.Y. 2015) ("Plaintiffs' assertion misses the point that bona fide commission-based compensation is decoupled from the time actually worked, which, according to the DOL and multiple circuits is a hallmark of how commissions work.") (internal punctuation omitted). In fact, the sole case Dash points to in support of his argument for uncompensated driving time is wholly inapplicable, as it dealt with the definition of compensable working time for

---

[44]   *Id.* at 17-20. For instance, Dash asserts that "ABGC's employees spend 30-40% of their time [three-to-four hours] driving between jobs, and are not compensated for that time." [*Id.* ¶¶ 5, 14.]

hourly employees under the Portal-to-Portal Act. *Brantley v. Ferrell Elec., Inc.*, 112 F. Supp. 3d 1348, 1369 (S.D. Ga. 2015).

ABGC presents evidence that, even though Dash was not specifically compensated for these non-work activities, they were included in the time records used to compile Dash's regular rate of pay.[45] Indeed, these records included all the time between when Dash left ABGC to perform a job until he arrived back at ABGC at the end of the day. Dash points to no evidence to the contrary. While in hindsight Dash would, of course, like to be paid for every hour of the day, he agreed to be paid through commissions—not an hourly wage—and was not entitled to receive compensation from ABGC for all hours of the day. *See Powell v. Carey Int'l, Inc.*, 514 F. Supp. 2d 1302, 1311 (S.D. Fla. 2007) ("The 'regular rate' under the FLSA is a rate per hour. The FLSA does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis.") (*citing* 29 C.F.R. § 778.109) (internal punctuation omitted).

---

[45] ECF 47. In fact, ABGC asserts that "[t]he time records maintained by [ABGC] encompassed all time [Dash] spent on the job, starting from the time he left [ABGC's] premises to the time he returned, including all breaks, rain delays, driving time, and return visits to customers." [*Id.* at 13.]

Finally, Dash claims that he "typically spent approximately 30-50 minutes before and after the work day for which he was not compensated."[46] Unlike the previous non-compensable activities (*i.e.*, driving time, rain delays, and break time), these additional 30-50 minutes were not recorded on Dash's time sheets or made part of the initial computation of his rate of pay.[47] In light of this, Dash argues that "ABGC failed to maintain the records required by the Code of Federal Regulations," and this failure "precludes summary judgment because it is impossible to determine a true and accurate 'regular rate of pay' without those records."[48]

Dash's argument does not create a genuine issue of material fact or preclude summary judgment. In *Klinedinst v. Swift Investments, Inc.*, neither the employer nor the employee kept a record of the number of hours the employee worked on a weekly basis. 260 F.3d at 1257. At the summary judgment stage, both parties offered contradicting statements as to the number of hours the employee actually worked. *Id.* The Eleventh Circuit remanded the case back to the district court because "neither we nor the district court can ascertain from the record developed

---

[46]   ECF 41-1, ¶¶ 14, 25.

[47]   ECF 47, at 13.

[48]   ECF 41, at 16.

to date [employee's] 'regular rate' to compute his overtime compensation." *Id*. Thus, according to the Eleventh Circuit, the "number of hours worked per week is a genuine issue of material fact for the factfinder." *Id*. (*citing Brennan v. Valley Towing Co.*, 515 F.2d 100, 111–12 (9th Cir. 1975)).

This case differs from *Klinedinst* in that ABGC collected and maintained records detailing the number of hours Dash worked each week. Although Dash complains that he was not compensated for all those hours, he does not argue the amount of hours is incorrect except for the alleged additional 30-50 minutes before or after a shift. In any event, this unreported time does not create a genuine issue of material fact because Dash concedes ABGC under-captured his actual working time by, at the most, 50 minutes per shift.[49] Rather than simply disputing Dash's (unsupported) assertion, ABGC provided evidence that, assuming the truth of Dash's allegations and adding 50 extra minutes per day for the weeks he worked at least 40 hours (even though Dash never worked every day in a week), his rate

---

[49] ECF 41-1, ¶ 25. Dash "objects to this [undisputed material fact] to the extent it requests a legal conclusion from [Dash] regarding the definition of 'hours worked' as that phrase related to 'compensable time.'" [*Id*.] However, Dash does not cite to any record evidence in his objection. [*Id*.] Also, the 50 unrecorded minutes have no bearing on Dash's alleged "compensable time." [*Id*.] Finally, based on Dash's response and testimony, 50 minutes per shift is the maximum amount of unrecorded time Dash is claiming he worked. [*Id*.; ECF 36-4 (Dash Dep. Tr. 147:25–149:24, 151:23–152:3).]

of pay averaged $27.90 per hour and never fell below $22.50 per hour.[50] This amount clearly exceeds the statutory minimum of $10.88. What's more, ABGC's evidence shows that, even if an additional 20 hours per week were added to Dash's timekeeping records (a number far exceeding any of Dash's allegations), his rate of pay still averaged $19.23 per hour and never dipped below $11.46 per hour.[51]

Taking Dash's allegation as true, his rate of pay always exceeded the statutory minimum of $10.88. Dash, in fact, fails to point to a single week in which his rate of pay was less than $10.88 per hour and relies wholly on speculation and conjecture. Courts in this Circuit have permitted an employer to satisfy the "rate of pay" element under similar circumstances. *Kuntsmann v. Aaron Rents, Inc.*, 903 F. Supp. 2d 1258, 1268 (N.D. Ala. 2012) ("[N]either [employer] nor [employee] have produced a record of [employee's] . . . weekly working hours. . . . The only indication the court has of [employee's] weekly working hours is based on his testimony that he worked '50–60' hours a week. . . . even accepting [employee's] testimony that he worked sixty hours per week, his regular rate of pay would exceed one and one-half times the minimum wage."). *See also Battle v. DirecTV, L.L.C.*, No. 2:14-cv-02007-AKK, 2017 WL 4076205, at *8 (N.D. Ala. Sept. 14, 2017)

---

50   ECF 36-3.

51   *Id.*

("The court . . . is not convinced by the [employee's] contention that an employer who fails to track its employees' actual weekly hours cannot rely on the employees' testimony to meet this element of the § 7(i) exception."); *Forster v. Smartstream, Inc.*, No. 3:13-cv-866-J-PDB, 2016 WL 70605, at *5 (M.D. Fla. Jan. 6, 2016) (citing *Kuntsmann* and holding that "if the employee produces undisputed evidence regarding his working hours, the court may use the estimate on summary judgment to determine if those hours, combined with the records of the employee's compensation, establish the employee's regular rate of pay above one and one-half times the minimum wage."); *Henriquez v. Total Bike, LLC*, No. 13-20417-CIV, 2013 WL 6834656, at *3 (S.D. Fla. Dec. 23, 2013) ("Taking [employee's] estimate as true for the purposes of this Motion for Summary Judgment, a review of [employee's] total compensation demonstrates that [employee] was always paid in excess of one and one-half times the applicable federal minimum wage.").

Therefore, there is no genuine issue of material fact and Defendants have met their burden of establishing that Dash's rate of pay exceeded the minimum required for the commissioned work exemption.

### iii.   Dash's Compensation from Commissions Exceeded the Statutory Requirement.

For the final element, "[t]o rely on the retail or service establishment exemption, Defendant must demonstrate that more than half of Plaintiff's compensation for a representative period of at least one month represents commissions on goods or services." *Lee*, 651 F. Supp. 2d at 1365. According to 29 U.S.C. § 207(i), "[i]n determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee."

Neither the FLSA nor DOL guidance provides a definition for the term "commission" as it is used in 29 U.S.C. § 207(i). *Owopetu v. Nationwide CATV Auditing Servs., Inc.*, No. 5:10-cv-18, 2011 WL 883703, at *3 (D. Vt. Mar. 11, 2011) (*citing Parker v. NutriSystem, Inc.*, 620 F.3d 274, 278 (3d Cir. 2010)). Indeed, what constitutes a commission under the FLSA "is an issue that finds little illumination from the sparse case law and the vague references in statutes and regulations." *Klinedinst*, 260 F.3d at 1254. As guidance, courts have stated that the "essence of a commission is that it bases compensation on sales, for example a percentage of the sales price." *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 508 (7th Cir. 2007). The question of "[w]hether a particular payment system constitutes commissions

is an issue of law." *Jones*, 2013 WL 6072966, at *10 (*citing Klinedinst*, 260 F.3d at 1254).

Dash was employed by ABGC as a crew foreman from March 2015 through August 2018.[52] Throughout his employment, Dash was paid on a weekly basis through ABGC's commission-based pay structure.[53] At no time did Dash receive an hourly wage.[54] Pursuant to this pay structure, Dash would be paid either 10% or 13% of the gross revenue from a job, depending on whether it was a two-or-three person crew.[55] Dash admits that, although his pay and hours varied from week to week,[56] there was not a single month during his employment where his commissions did not constitute at least half of his compensation.[57] In fact, ABGC points to evidence that "regular commissions accounted for over 92% of [Dash's]

---

[52]   ECF 41-1, ¶ 13.

[53]   *Id*. ¶ 14, 19.

[54]   *Id*.

[55]   *Id*. ¶ 17.

[56]   *Id*. ¶ 20.

[57]   *Id*. ¶ 15.

compensation over the course of his entire employment."[58] Dash does not dispute this percentage or point to any evidence to the contrary.[59]

Dash makes much of Seaborn's admission that ABGC did not create or disseminate a written memorandum when, in 2014, it shifted from compensating its employees on an hourly rate to its commission-based structure.[60] However, this is largely irrelevant, as the switch occurred before Dash's employment; Dash was always compensated by commission; and Dash presents no evidence indicating ABGC set the commission rate in bad faith or in an attempt to avoid paying him overtime compensation. Further, Dash's concession that his work hours routinely varied from week-to-week is an important consideration. *Alvarado v. Corp. Cleaning Servs., Inc.*, 782 F.3d 365, 368 (7th Cir. 2015) ("A more important consideration is that commission-compensated work involves irregular hours of work.").

Based on these undisputed facts, the Court finds, as a matter of law, that more than half of Dash's compensation was derived from commissions on goods or services as required for the exemption. Since Defendants have established all

---

[58]   ECF 36-3, ¶ 16; ECF 41-1, ¶ 16.

[59]   ECF 41-1, ¶ 16.

[60]   ECF 41-2 (Seaborn 30(b)(6) Dep. Tr. 128:1–23).

three elements required for the commissioned work exemption, and giving the "commissioned work exemption" a "fair reading," the Court finds that Defendants have met their burden of demonstrating the exemption applies to Dash.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [ECF 36] is **GRANTED** and Dash's motion for conditional class certification [ECF 18] is **DENIED AS MOOT.**

**SO ORDERED** this the 20th day of March 2020.

Steven D. Grimberg
United States District Court Judge